Case number 21-1335, Heath Douglas versus Nancy Douglas. Oral argument is not to exceed 15 minutes per side. Ms. Speaker for the appellant. Good morning. Good morning, your honors. Lisa Speaker for the appellant, Father Heath Douglas. This is a wrongful retention case. My client, Mr. Douglas, desperately wants to see his child and therefore filed a hate convention petition, not only to have the child returned to Australia, but also to have the Australian courts decide this child's custody under Australian law. Now, as this court is aware, the goal of the hate convention is to restore the child to pre-abduction status quo and to deter parents from wrongfully removing or country. Now, the key to this case is that unlike I think every single case that was cited in both parties' briefs, this case was decided on summary judgment. Many of the other cases, as we noted in our brief, had multiple days of trial or evidentiary hearing before the trial judge decided the facts of the case and to make that habitual residence decision. This court, sorry, the district court in this case, even though the court had it for 10 months before that habitual residence decision was made, did so on a summary judgment motion. And it's really important to reflect that in deciding summary judgment, the trial judge is supposed to view the facts in the light most favorable to the non-moving party in this case. Do you think if there were a bench trial, this would end better for your client? So there are facts that, not all the facts would have come out obviously during the summary judgment record, but the part, the key to this is that the judge did not get to view the credibility of the witnesses. So the judge is doing it based on a cold record and is not seeing the credibility of the witnesses. And there's more explanation that a witness can provide in examination or going to achieve in just reading the record of documents. And yes, there was deposition testimony. So one, my first reaction when I looked at this case was to think, oh, how unfortunate. I really wish the district court had had a bench trial and we'd have findings of fact. And we know that there's a lot of deference to those findings of fact, but it did occur to me that, you know, in these cases, speed is often really important. And I don't understand why it's not appropriate to have summary judgment sometimes, you know, getting the witnesses together was not going to be a picnic, right? Your client would have had to fly from Australia. That would have been very expensive. And so I guess I'm not sure I get the point that this might make it easier for you to get the district court decision reversed, but I'm not sure it's such a bad idea from time to time to have this done in summary judgment. Well, you raise an interesting point, Judge Sutton, because because of the speed issue, the courts have said that six weeks is the turnaround time that should be taken for return order. And the district court in this case took 10 months. So the premise that summary judgment may be a good mechanism to resolve these cases quickly may be true in other cases. I just don't think that actually played out that way as it should in this case. And moreover, the trial judge made his decision without viewing the facts in the light most favorable to my client. Give an example of a material fact that, you know, because there is, I mean, there's so many emails here, and there is quite a bit of evidence that your client ultimately was comfortable with J.D. moving to Michigan. There is quite a bit in that direction. First of all, this is not a removal case. It's a retention case. So there's no question at all that my client granted permission for the mother to take the child, J.D., to Michigan. And there was the whole context of how that came about. And you used a phrase, Your Honor, that I think points to the factual record and the dispute of fact that we have. You said that she had permission to move to Michigan. And in fact, my client granted permission for her to travel to Michigan. And as revealed even in the summary judgment record, he explained, you know, what his thought process was at the time that he, you know, wanted to give her space because he wanted the marriage to succeed. He wanted her to come back and for them to raise a family together. He wanted to give her the space she needed so that she didn't feel like she was trapped. He wanted to enable her to go be with her family and friends in Michigan. But his intent in doing that was for her to return. And in fact, she represented to him that she had a return plane ticket. Now, again, the fact that he did not ask to see that plane ticket has been used to criticize my client. But when viewing the light in the most favorable to my client, the whole context of it was that he was trying to give her the space she needed. Was there any specification of when the return was? I mean, it might not have been a lie at all. She might actually return at some point to Australia. In fact, I would submit the odds are quite high that will happen with the half Australian child. So a return ticket, what does that mean? It could be 10 years. Well, I don't think you can purchase a ticket that returns in 10 years, your honor. In fact, you can't purchase a ticket for more than a year away. So I mean, to say that anyone that thinks it's material, that it's a return ticket, I should think would want to know when. Right. And I'm sure he did want to know when. But in the context of the documents and the testimony that we do have in the record, he didn't want to make her feel pressured that he was going to be interrogating her about when she was coming back precisely. And he testified that he thought that she would just be gone for a few months, would give her a chance to, you know, gather herself. She's a brand new mother, spend time with her family. So again, we're talking about viewing the facts and the light most favorable to my client, but certainly material disputes that were relevant to this case and the judge. So going back to the judge's trial court order, there's I think two, there's legal. We've already spent some time talking about the factual problems about how the judge didn't view the facts and light most favorable to my client. But on the legal side, the judge made a couple of comments, which I think we need to legally question where the judge was coming from. One thing is that the judge said in his very first point in holding habitual residence was not in Australia, is that shared intent is only one of the factors to decide habitual residence. Well, from my reading of this court's multiple decisions, and then the obviously United States Supreme Court decision on Minaski versus Tagliari, which also came from this court, there's two standards to decide habitual residence, acclimatization standard, which is used for older children, shared intent, which is used for younger children, particularly for infants. And in fact, I think in reading those cases, what we can glean from that is that when it's referring to an infant, the courts maybe haven't said it directly, but I think we can read it from the opinions that shared intent is actually the most significant factor. I would respectfully disagree. And I thought that was the genius of Justice Ginsburg's opinion, that it was a totality of circumstances, common sense. If you have fact findings by the trial court, pay attention to them. But it's very dangerous to think one other case is going to be like the next case. They're all very fact-driven and context-specific. And there's an awful lot of evidence here that this was the place where he was getting acclimated. I mean, the problem with the divorce situation is the marriage breaks down. There is nothing shared at all. They have a shared child, but they don't have shared intent. So it's a very funny thing to say that's the end-all be-all. And I think that's why they said totality of circumstances. I 100% agree with your honor that it is still a totality of the circumstances standard. I'm not trying to suggest that it's not a totality of the circumstances, but in that totality of circumstances, there's a lot of facts that weigh into whether the parties had a shared intent. And we have a whole host of them listed in our brief, of course, about all the pre-birth activities that happened. But the shared intent, and you referred to the acclimatization standard, and the courts have been very clear that you really can't apply that standard to an infant because the infant's not going to have a chance to really acculturate himself into whatever home it is, whether it's Australia or the United States. It's not really the appropriate standard, which is why I think, in fact, this court is the one that developed the shared intent standard to at the time. And the other problem I have with the child- Does your client have rights to see JD right now? No, your honor. And tell me the state of affairs. Are you making the point he can never see his child again? Is that what you're trying to say? No, your honor. There's a divorce case that's pending in Michigan, but it really was not appropriate for the custody portion of that to be pursued in Michigan at all. While this case is pending, and the Hague Convention tells us that it shouldn't be pursued while the Hague Convention case is pending. And then the divorce case, there's no jurisdiction over my client, who has no connections whatsoever. But the parents don't have an agreement that if Heath wants to come to the U.S., he can see his kid? No, your honor. In fact, the record reflects that he did indeed come to the United States because he was trying to find out for sure where the mother and his child were before he could his petition, the Hague Convention petition. I thought he saw him at that visit. My understanding from the record is he did not see them. He spoke to my client, his wife's father. He spoke to Mr. Robinson, the grandfather. And my understanding from the record, and I apologize, and I'm sure Mr. Cunningham will correct me if I'm wrong. My understanding was that August 2019 he did not have an opportunity to see either his wife or his child. And so, no, because there's no custody determination, there is no parenting time order in place. Everything has been held up for the decision about which country is the one that gets to decide it. Now, he did attend a friend of court hearing in Ingham County, I believe in October 2019. It's a little bit different in Michigan with the conciliation process. It wasn't the judge. It's somebody, a person at the front of court at the county level who's trying to help the parties come to a resolution. And he did appear for that by Zoom. But there's no order, to my knowledge, that came out of that. And there's certainly no binding order because we don't even know which jurisdiction has the authority to make a custody decision yet. This case in front of this court has to be decided before that. And I want to point out my one other problem I have with the trial judge's opinion, at least on the legal front, because we've already talked a lot about the facts. The judge in his decision seems to discount almost completely all the pre-birth events that occurred that would demonstrate the shared intent of the parties raising the child together in Australia that would lead us to conclude that habitual residence in Australia was appropriate. And in fact, the reason I have a legal issue with is because there are multiple cases, including from this court, where the pre-birth facts were held to be relevant. So I think you're quite right that those are the best facts for your side. I quite agree with that. But what do you do about the reality that the marriage broke down three days after the birth? So the reality is that in many of the cases that were discussed in our right around the time or even before the child was born, but that doesn't change who the child's habitual, just because the marriage is breaking down, doesn't mean that the child's going to permanently move to the United States. So there's, I'm just saying, you know, for example, the 10 year plan, that sounds pretty good on your side, but no one would have thought there was a 10 year plan in place three days after JD's birth. So the fact that the parties are having marital difficulties, and I would posit that the record reflects my client wanted to work on the marriage. He loved his wife very much. And that was why he gave her permission to go to the United States. There's a disconnect in what you're saying, because the fact that they might have divorce in their future does not mean the child is leaving Australia permanently. Okay. Now you'll get your full rebuttal. So Mr. Cunningham, we'll hear from you. Thank you, Your Honor, may it please the court. I must say it's a pleasure and honor to be here. And I thank you. And I also want to thank the court and the staff assistance to move the time up. But I appreciated that very much. Well, thank you for accommodating us. Thank you. So I in the time allowed, I'd like to focus on a couple of things. One is the quality and the extent of the record. I'd like to focus on the time lapse issue. I'd like to talk a little bit about consent. And finally, I'll end up with this shared intent concept. Let's just let's just see if we can take one thing off the table. Yes. Don't you agree that given that this was a summary judgment decision, it's de novo review and not clear air review? Yes. Do you agree with that? I do. I do, Your Honor. Okay. I do. Okay, keep going. Why did it take so long for a summary judgment decision? That is kind of puzzling because normally you have a bench trial and it looks in retrospect, there was enough time for a bench trial. Well, immediately after the case was filed, counsel, both counsel agreed, trial counsel agreed that the that the issue would be habitual residents. That's what Hague tells us to determine. And a discovery plan was put in place. It was followed very carefully. Briefs were made, motions were filed. I think there was some lapse of time in this whole procedure that that that the world is in right now. I think that it's something to do with it. But at least from it, and there was some adjournments by both sides, to the extent of filing additional discovery, but but it did move as quickly procedurally as a as a good I don't think either party was calling the unfair delay or undue delay in the process. So, Your Honor, I guess what I'd like to point out is the quality and the extent of the written record that the court had. We had 193 pages of sworn testimony by the parties. We had 540 pages of written discovery. And there were 178 pages of exhibits to the motion and the answer. So the court has a very extensive record, not only on the habitual residence issue, but quite candidly, there's there's very little that can otherwise be developed for trial. Quite candidly, the court had had it all. And I think the time lapse is very important. Counsel's correct. The Hague case does require promptness. So we need to look at the appellant's promptness here. What do you make of the point that your friend on the other side was making towards the end that, you know, before the birth, there were some there was there's considerable evidence that they really did seem to be thinking they would settle in Australia, right? I mean, she's moving to get status that allows her to stay longer. They've got this 10 year plan. You know, you do have a sense that that is what they had in mind, at least before the birth. Isn't that powerful evidence? It would be. Yeah, yeah, it would be. But the soon after the marriage, the conduct of the parties broke down those arguments, there were fights all admitted by by the appellant. They went to counseling, several different types of counseling. The appellant did not like the concept of counseling and the philosophy of it. They had the concept they spoke about divorce. Divorce was actually discussed before the parties separated when they did separate. That was three days. And he admitted, I kicked her out three days after the birth. And within a matter of weeks, he moves back to his home three and a half hours away. So clearly, there was the only the only I would suggest and I'll skip skip ahead here about shared intent. The only real shared intent that these parties had at the operative moment was the consent that the child and mother were going to go to to to America. I mean, there were lawyers letters, there was the written notes. When would you say that shared intent occurred? Because I would not have said there's a shared intent on the day of birth, that the child was going to America, that doesn't seem fair to me. So when did when would you say it's crystal clear, the shared intent was America? He appellee, our client emailed him and wrote to him and said, the marriage is over, we are officially separated. And within days of that, she hired counsel in Australia, who sent a letter to him saying, we are intending to move back back to your wife and the child are intending to return to the United States. And he's he wrote he emails Nancy's father and says, you win, Bill, your daughter's coming back. So certainly within within weeks of the birth of the child, plans were put in place. That was within weeks. I thought that was a little longer. No, it was it was December, the lawyer's letter, the record shows was in December. And they and he had one one parenting time visit for 30 minutes, it was supervised. He was writing, she asked for his assistance in passports and all that he granted that assistance in writing, no expectations, no, no, no conditions, no expectations. He wrote right on that he never asked to see anything about looked at the totality of the circumstances then and said, he either knew or should have known the marriage was over, she was returning, and she's not coming back. And there was just, blessedly, we have, we just don't have conversations, we had writings between the parties. And he wished her well, and, and often and signed off the documents, he he actually filed a custody lawsuit and then dismissed it. 14 days later, I mean, if that's not, that's, that's consent of it, I would certainly think. And I think was very important when when the divorce was filed in October. So from February, January, February to October, that's that's eight, eight months or so he doesn't do anything. He gets the divorce papers participates in the divorce case, okay. And then, I mean, if filing of a divorce case isn't isn't alarm bells going off, they certainly should have, but he doesn't do anything at all until writing the Hague application letter in December. And then he still doesn't get around to filing his, his petition until May of 2020. So that's, that's like 17 months. Now, the court knew that too. And if and if that's, and if that's somewhere that takes us somewhere between consent and acquiescence and also one year settled. So, so I think the court was well aware that these proponent evident these defenses, which are preponderance, would probably do even if there was a habitual residence, quite candidly, these defenses by by preponderance probably would have made the day and I think that is what was persuasive to the court that this would that this was a summary disposition candidate. Do you think this is an acquiescence case, not a habitual residence case? I think I think the the consent and acquiescence is that is the defense habitual residence was but even if the court just just plain devil's advocate, even if the court was concerned enough about habitual residence to try the lawsuit, these defenses, preponderant defenses are just clearly made in this enormous record that would what we've created. So I think the court was well aware. Yes, let's determine habitual where does the I have a return ticket fit into consent and acquiescence. In other words, isn't it possible that the argument is the consent and acquiescence were premised on the idea she was coming back with JD? A good question, Judge. Thank you. And I suppose, sure, that could that case could be made. But the totality of the circumstances, all the writings in the agreements back then, I mean, he never asked to see a ticket. He wrote on the back of that very day that conversation happened. He wrote no conditions, no expectations, and he cited Luke chapter 14 or something. So viewing that, I mean, he didn't make any effort. He didn't make any. It was Luke 730. Don't use that quite often. It's hard to miss. Sorry. I'm showing my my Bible lack of knowledge. No, no, no, I don't have any. I'm just telling you, I saw a lot. I didn't go look it up. I didn't go look it up. Thanks. So when you look at all of that, he didn't ask to see it. I mean, his decision was made there. Their marriage is over. They're going back. And then he waits. So I mean, he had any concerns about like, hey, where the heck are you? He didn't. He didn't. He didn't file a lawsuit. He didn't do anything that is required in terms of the process of, you know, of a speedy thing. So so 18 months has gone by before the lawsuits filed. I mean, that's somewhere between one year and settled somewhere between consent. And, you know, there's certainly case law that says revoking, revoking consent is insufficient. But it is it's fair to say the district court saw this as a habitual residence case, right? Yes. And not a consent, not a consent case. No, it was the prime primary purpose in this lawsuit to determine habitual residence, because that's the answer to that question is the be all end all of the case. Now, he doesn't have rights to see J.D. right now, and he has not seen him in America yet. He has not seen him in America yet. The divorce, the parties, actually, the parties granted were granted a divorce fairly recently. But the court is reserving ruling on custody and parenting time until this case is resolved. And so quite candidly, parenting time will can be and I'm fairly certain will be established in the divorce case. He's not banned. He's not prohibited. And he brought this action on. He may have done it may have been prudent for him to finish the divorce case. And he would have had almost a year of parenting time arrangements made under some sort of court supervision. There was a very the friend of the court investigation was very thorough and it was asking certain things. It found that there was violence in the marriage. It found that he really needs to have a psychological profile done. So but all that was in place and judge that was in place in October, October 2019. He still doesn't file a lawsuit for another seven months. I mean, somewhere along the line, the alarm bells were going to go off and the time delay is on him because clearly, clearly the Hague requires promptness. And it wasn't it wasn't it wasn't there. And I and I and I mentioned shared intent. That's the only thing we really know. They agreed that she that she could go. And if he's sort of has a post, I think the court with one case called it post hoc regret is insufficient to overturn a habitual residence. Your Honor, I think I'm going to take a quick look at my counsel. He gave an explanation for that. And within the context of this failing marriage, I think it's a, you know, it's a plausible explanation that he was trying to be less controlling. But why? Again, I mean, I when I first read this, I had the same reaction as Judge Sutton. Like, why not just have the trial? Why? Why? How can we say that there were no facts in dispute that were material and that the party's credibility was irrelevant? Judge, good question. Thank you. I think the court was was very attuned to the Manaski decision. And it's the totality of the circumstances in this, the material facts, you know, we're all good writers. We hate adjectives, but that's an important one. The material facts, were they absent or were they present? And an interesting thought, too, is, is that, is that Mr. is that he got very excited and upset at the, and uses the date of the filing of divorce. And he's also, and that was because it was an opposition to his Christian principles. Well, if Nancy never filed for divorce, we might not even be sitting here at all right now. And so, but that tells us that he should have been doing something. And to come along and say, in November 9th, 2020, there's a deposition. And now I've just found out there were no return tickets. Well, he had 17 months. He had 17 months to either ask for it, make a demand or file a lawsuit. And, you know, time, time weighs on this process in the acclamation for that child. So I think it's the material, the total totality of the material facts, because Judge Mahoney certainly could have said, well, you know, I'm not, I'm not doing MSD. He understands he's a, he's a, an extraordinary jurist. He understands the, the, the burden of terminating a case before trial. And I don't think this court took that lightly, but at the same time, I think the court was quite clear that, that given the, the, the breadth of the evidence and given what, what a trial was going to look like, I think that was part of the totality of the circumstances. I think he concluded that appellant would not prevail at trial and therefore a summary disposition would be appropriate because it does bring this case to a conclusion sooner. All right. I think, I think we understand your argument, Mr. Cunningham. Thank you very much. Thank you for accommodating everybody's schedule. And Ms. Speaker, you've got some rebuttal time. Thank you. Just really quickly to address some of the comments and questions that have been made. First, the defense of acquiescence, I don't believe that has, that's not an issue in this case at all. And, and Mr. Cunningham, brother Cunningham goes through a lot about the timing and blaming my client for not taking action sooner. He said specifically that from February to October, 2019, he didn't do anything. That actually is not true. One, there was an order or some, we call it an Advo in Australia, where he was not permitted to contact his wife because he, he's a very ardent emailer. He emails a lot and he was doing that with her. And she shut that down with the, this Advo procedure. And then when that finally was lifted, he started emailing her again. And then in fact, he came to the United States in an attempt to figure out exactly where the child was. So to say that he did nothing from February to October, 2019, it's just not supported by the record. And then of course, as you know, the trial judge in this case determined that the date, the relevant date for determining habitual residence was October 2nd. And so all this, whatever time happened after October 3rd is not relevant to that habitual residence question. But whether, you know, he filed his, his Hague convention, not the petition, but the paperwork with Australia in October. So shortly after learning about the divorce suit, October 31st, he's filing his paperwork in Australia. And at that point, I still think he had to determine where the child was exactly, which was needed for the petition. Now going to his counsel, how do we, how do we look at that time from, from February to October? So in terms of the habitual residence. So he granted as the record reflects, he wanted to preserve the marriage. He wanted to give her space. She had a history as reflected in the record of changing her mind. She needed space. She, even while they were living in Australia, she'd go away for a few days at a time. And he, you know, realized after he, I think after he received that attorney letter in December 3rd, 2018, he didn't agree to the parenting time proposal that was in there. He did not agree to her moving. She changed her tactics. And that's when she decided to lie to him about returning. And so she didn't leave until February. So he consented to her taking the child to Michigan. You don't have to waste your time on that. I don't know. I'm sorry if I, if I wasn't answering. All right. Well, thanks to both of you for your helpful briefs and arguments. These cases are very difficult in lots of respects, both the timing and the challenges of doing the right thing by the child and the parents. So thanks for your good work on this. Thanks for answering our questions today. And you asked us to handle this quickly and that's why we did the argument quickly and we'll do our best to get an opinion out quickly.